**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0529-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARRYL WATSON, a/k/a
DARRYL J. WATSON,

     Defendant-Appellant.

_____

          Submitted April 15, 2026 – Decided July 14, 2026

          Before Judges Vanek and Jacobs.

          On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 21-12-2523.

          Jennifer N. Sellitti, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

          Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent (Shep A. Gerszberg, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Darryl Watson appeals from his convictions and sentence for attempted murder, aggravated assault, and related riot and weapons charges. We affirm.

I.

In September 2021, defendant was detained at the Essex County Jail pending charges unrelated to this appeal. The inmates are housed in "pods." Each pod has two levels, with sixteen cells per level and two inmates assigned to each cell. A single corrections officer is stationed inside each pod and is responsible for supervising the sixty-four inmates housed on each level. Each pod is monitored by two video cameras.

On September 23, another inmate, Jayshawn Boyd, was moved to the second level of pod 3-C, where defendant was housed. That day was designated for general cleaning of the facility and commissary distribution. Some of the inmates, including defendant, were assigned to help distribute commissary bags. Corrections Officer Jeremy Alvarado opened Boyd's cell so his cellmate could claim his commissary order. Boyd exited his cell against Officer Alvarado's instruction, descended to the first level and said, "I want to fight. Where they at?" In an effort to restore calm, Officer Alvarado told Boyd to speak privately with him, but Boyd refused. Inmate Davon Branch also attempted to de-escalate

2

the situation by encouraging Boyd to speak with Officer Alvarado. Boyd ignored the request, screamed profanities, and ran about, cursing and spitting on other inmates, as Branch later testified.

Office Alvarado ordered the civilian commissary worker to leave the unit and cancelled the commissary deliveries. Boyd continued to pace back and forth on the first floor. Meanwhile, defendant and other inmates, assisting staff with commissary duties, were out of their cells. All inmates refused Officer Alvarado's orders to return to their cells. Officer Alvarado alerted other officers a fight was imminent.

Boyd began a fist fight with defendant and inmate Isaad Jackson. Multiple inmates joined the fray. Officer Alvarado repeatedly ordered the inmates to return to their cells and "lock in." They did not comply. Following safety protocols, Officer Alvarado exited the pod and observed the fight from behind a protective window. He witnessed seven inmates—including defendant— punch, kick, and attack Boyd with various items, including a microwave oven, a water cooler, and broomsticks. With the assistance of two other officers, Officer Alvarado entered the pod to restore order. Officer Alvarado identified defendant and his co-defendants as the assailants.

A physician, Dr. Rommel Montilus, also responded and found Boyd

A-0529-23

motionless on the floor. He observed Boyd bleeding from the head with labored breathing. Boyd was transferred to a hospital, where Dr. Fariha Sheikh treated him. Dr. Sheikh diagnosed Boyd with trauma, epidural hematoma, facial fractures, acute respiratory failure and hypoxia, traumatic brain injury, skull fractures, orbital-floor fractures, and jaw fractures. He remained hospitalized for eighty-two days, surviving his injuries.

In December 2021, an Essex County grand jury returned an indictment charging defendant and six other inmates with twenty-one counts, including: conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) and 2C:11-3(a)(1), (2); first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1), (2); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); third-degree riot, N.J.S.A. 2C:33-1(a)(3); and third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a).

The court presided over the jury trial of defendant, Jackson, and Byad Lockett from May through June 2023, having severed the trials of the other defendants. At trial, the State called multiple witnesses, including Dr. Montilus, Dr. Sheikh, and Officer Alvarado. Defendants called inmate Davon Branch.

4

As Dr. Montilus took the stand, the prosecutor elicited his credentials and tendered him as an expert in general medicine. Defendants objected, arguing the State had hampered their ability to prepare for cross-examination by failing to disclose the doctor's medical findings and opinions. The court permitted the doctor to testify as an expert in general medicine but restricted the scope of his testimony to the contents of a one-page report he had prepared on the date of or right after the incident. The court also permitted the doctor to provide "a medical opinion" based on his report.

Branch testified, claiming Boyd provoked the melee. The State subsequently introduced a video that appeared to show Boyd had not spit on any specific individual, contradicting Branch's account of the events.

Counsel for defendants asked the court to instruct the jury on the lesser-included offense of attempted passion/provocation manslaughter, arguing Boyd's fighting words, his spitting at other inmates, and refusing to return to his cell constituted adequate provocation. The court conducted a Canfield[1] analysis and concluded a reasonable person would not have reacted in a similar manner to the alleged provocation. Accordingly, the court declined to instruct the jury on the lesser-included offense.

---

[1] State v. Canfield, 252 N.J. 497 (2023).

A-0529-23

The jury convicted defendant of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); five counts of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); five counts of third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and riot, N.J.S.A. 2C:33-1(a)(3). The jury acquitted defendant of all remaining counts.

At sentencing, the court merged and dismissed the aggravated assault and weapons convictions into the attempted-murder conviction and sentenced defendant to a term of twenty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, along with a concurrent five-year term on the riot charge. The court imposed the twenty-year term consecutively to a prior seventy-year sentence defendant had received for a December 2018 homicide.[2]

On appeal, defendant raises the following arguments:

> POINT I
>
> THE DENIAL OF DEFENDANT'S REQUESTED INSTRUCTION ON ATTEMPTED PASSION/PROVOCATION MANSLAUGHTER AS A LESSER-INCLUDED OFFENSE OF THE CHARGED OFFENSE OF ATTEMPTED MURDER WAS REVERSIBLE, PREJUDICIAL ERROR.

---

[2] This seventy-year term is subject to NERA.

A-0529-23

POINT II

THE ADMISSION OF THE DOCTOR'S EXPERT OPINION THAT BOYD WOULD HAVE DIED BUT FOR THE MEDICAL ASSISTANCE HE RECEIVED AT THE JAIL VIOLATED N.J.R.E. 702, THE EXPERT-OPINION RULE, AND RULE 3:13-3(b)(1)(I), THE DISCOVERY RULE, AND WAS REVERSIBLE, PREJUDICIAL ERROR.

POINT III

BECAUSE THE JURY KNEW THE OFFENSE OCCURRED WHILE DEFENDANT WAS IN JAIL, THE COURT'S FAILURE TO PROVIDE A CURATIVE INSTRUCTION STATING THAT DEFENDANT WAS NOT IN JAIL AS THE RESULT OF A PRIOR CONVICTION WAS REVERSIBLE, PREJUDICIAL ERROR.  (Not Raised Below).

POINT IV

THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING BECAUSE THE COURT FAILED TO APPLY TWO RELEVANT MITIGATING FACTORS AND CONSIDER THE OVERALL FAIRNESS OF THE AGGREGATE TERM AND BECAUSE THE AGGREGATE TERM OF 90 YEARS, 73 YEARS WITHOUT PAROLE, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

II.

Lesser-Included Offense

A trial court's "failure to instruct the jury on a lesser included offense that a defendant has requested" warrants reversal of a defendant's conviction only if "the evidence provides a rational basis" for the charge. State v. Dunbrack, 245 N.J. 531, 545 (2021) (quoting State v. Savage, 172 N.J. 374, 397-98 (2002)).

A key purpose of charging lesser-included offenses is to guard against the prospect that "a jury reluctant to acquit defendant might compromise on a verdict of guilt on the greater offense." State v. Sloane, 111 N.J. 293, 299 (1988). "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." Keeble v. United States, 412 U.S. 205, 212-13 (1973) (emphasis in original); see also State v. Jenkins, 178 N.J. 347, 363-64 (2004) (affirming vacatur of the defendant's murder conviction because the trial court's failure to properly instruct the jury on lesser-included offenses constituted reversible error).

Pursuant to N.J.S.A. 2C:1-8(e), "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Although "[a] defendant is entitled to an instruction on a lesser offense supported by the evidence regardless of whether that charge is consistent with" his defense theory, "sheer speculation

A-0529-23

does not constitute a rational basis." State v. Brent, 137 N.J. 107, 118 (1994) (citations omitted).  Thus, a trial court need not charge the jury on attempted passion/provocation manslaughter at a defendant's request if the charge is "inconsistent with [his] testimony" and "the State's version of the [events,] and is substantiated by no testimony in the record." State v. Crisantos, 102 N.J. 265, 280 (1986) (emphasis in original).

Pertinently, the passion/provocation offense "contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability."  State v. Robinson, 136 N.J. 476, 482 (1994).

> In our jurisprudence, attempted passion/provocation manslaughter is comprised of four elements: "[1]  the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying."  [State v.] Mauricio, 117 N.J. [402,] 411 [(1990)].  The first two criteria are objective, and the latter two are subjective. Ibid.
>
> [State v. Funderburg, 225 N.J. 66, 80 (2016) (alterations in original).]

The first inquiry is whether a reasonable person in the defendant's position would have been sufficiently provoked to "arouse the passions of an ordinary

man beyond the power of his control." State v. King, 37 N.J. 285, 301-02 (1962). In other words, "[t]he adequacy of provocation is measured by whether 'loss of self-control is a reasonable reaction.'" State v. Canfield, 470 N.J. Super. 234, 276 (App. Div. 2022) (quoting State v. Foglia, 415 N.J. Super. 106, 126 (App. Div. 2010)). "The generally-accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter." Crisantos, 102 N.J. at 274 (citations omitted). Although battery "has traditionally been considered, almost as a matter of law, to be sufficiently provocative," a physical touching that amounts to "a light blow" does not constitute adequate provocation. Robinson, 136 N.J. at 492 (quoting Mauricio, 117 N.J. at 414).

After reviewing the record, we conclude there was insufficient evidence of provocation to warrant a passion/provocation charge. Boyd's initial statements expressing a desire to fight were made in Officer Alvarado's presence on the second floor, where none of the defendants were located. Nothing in the record suggests the remarks were directed at any specific individual; rather, they were directed generally. Likewise, Boyd's subsequent fighting words were directed to many individuals as he ran about, spitting and cursing.

Spitting does not "arouse the passions of an ordinary man," King, 37 N.J.

A-0529-23

at 301-02, such that he would lose his self-control, Canfield, 470 N.J. Super. at 276. Although spitting may constitute a battery, it is of a lesser magnitude than "a light blow," which courts have consistently held does not constitute adequate provocation. Robinson, 136 N.J. at 492.

Because there was no rational basis for the attempted passion/provocation manslaughter charge, the court did not err in declining to submit that charge to the jury.

Expert Opinion

"We give substantial deference to the trial court's decision as to whether a witness is qualified to present expert testimony." State v. Rosales, 202 N.J. 549, 562 (2010) (citing State v. Jenewicz, 193 N.J. 440, 455 (2008)). "Thus, the 'court's witness-qualification decision is subject to essentially an abuse-of-discretion standard of review and will only be reversed for manifest error and injustice.'" Id. at 562-63 (quoting Jenewicz, 193 N.J. at 455).

N.J.R.E. 702 governs the admission of expert testimony. It provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Our Supreme Court has explained:

The Rule has three [basic] requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

[Jenewicz, 193 N.J. at 454 (citations omitted).]

"Th[e]se requirements are construed liberally" in favor of admissibility. Ibid.

Rule 3:13-3(b)(1)(I) governs the scope of discovery concerning experts to include:

[the] names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. . . .

Accordingly, an expert's testimony at trial should be confined to the content of their report. See State v. Mingo, 77 N.J. 576, 585-86 (1978); State v. Melvins, 155 N.J. Super. 316, 320-21 (App. Div. 1978). Our courts "have permitted experts, with appropriate qualifications, to explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury." State v. McLean, 205 N.J. 438, 460 (2011). We

12

addressed this very issue in the companion case of <u>State v. Lockett</u>, No. A-0249-23 (App. Div. March 16, 2026).[3]  There, we decided—and here reiterate, as noted by the trial court—that simply because a lay person "'can draw their own conclusion as to a person who sustained the type of beating and attack' did not preclude Dr. Montilus from explaining the implications of Boyd's injuries to a degree of medical certainty."  We are therefore satisfied the court did not err in permitting Dr. Montilus to offer opinion testimony that was helpful to the jury without invading its province as the ultimate fact-finder.

<u>Limiting Instruction</u>

Defendant argues the court committed reversible error by failing to instruct the jury that defendant was not incarcerated due to a prior conviction. Specifically, defendant contends:

> Here, the jury was expressly informed that [defendant] was in the Essex County jail <u>when he committed the offense</u> for which he was on trial.  Evidence that [defendant] was in jail before he committed the charged offense invited the jury to speculate that he was incarcerated because he was convicted of a previous offense.  But that was not true, and the jury should have been instructed accordingly.
>
> [(Emphasis in original).]

---

[3]  We cite an unpublished companion case pertaining to co-defendant, Byad Lockett, in an opinion concerning the same underlying incident.  <u>R.</u> 1:36-3; <u>Zahl v. Eastland</u>, 465 N.J. Super. 79, 86 n. 1 (App. Div. 2020).

Because this issue was not raised at trial, we review the record for plain error. Under this standard, we reverse a conviction only if the error is "clearly capable of producing an unjust result." R. 2:10-2; see also State v. Burns, 192 N.J. 312, 341 (2007) ("In the context of a jury charge, plain error requires demonstration of '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'") (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

We begin by recognizing this case involves an altercation within a correctional facility. Immediately before opening statements, the court instructed the selected panel of jurors about this setting:

> . . . Now, you learned during the course of jury selection, and you're going to hear testimony, that . . . defendants and the victim were in jail at the time of this alleged incident. You must not speculate about the reason . . . defendants and the victim were in jail at the time of the alleged incident. This fact should not enter into your discussions or your deliberations in this case in any manner as you decide whether the State has proven each of the defendant[s'] guilt of the charges beyond a reasonable doubt.

Defendant's argument rests on a misreading of the record. The jury was, in fact, instructed not to speculate about the reason for defendant's incarceration

14

at the time of the incident. Although the court did not expressly state—as defendant now suggests it should have—defendant was not incarcerated because of a prior conviction, the instruction adequately addressed the underlying concern by directing jurors not to consider or speculate about the reason for his confinement. We are therefore satisfied the charge sufficiently dispelled any potential prejudice. As the State observes, because defendant did not request any additional instructions, there is a presumption he did not view its absence— much less its broadest application—as prejudicial. State v. McGraw, 129 N.J. 68, 80 (1992).

Sentencing

We "affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

At sentencing, the court found applicable aggravating factors two (gravity and seriousness of harm inflicted), three (risk of reoffending), six (prior criminal record), and nine (need for deterrence). See N.J.S.A. 2C:44-1(a)(2), (a)(3),

A-0529-23

(a)(6), (a)(9). It found no mitigating factors. The court was "clearly convinced that the aggravating factors substantially outweigh[ed] the non-existing mitigating factors."

The court explained its reasoning for not finding any mitigating factors, including mitigating factors three (defendant acted under a strong provocation) and five (the victim of defendant's conduct induced or facilitated its commission), see N.J.S.A. 2C:44-1(b)(3), (b)(5), the subject of defendant's argument:

> Mitigating factor number three is that the defendant acted under strong provocation. Well, we've heard a lot of testimony in this case and we've seen the video and we've seen what led up to this savage beating. And while . . . Boyd only entered this particular pod of the jail the very same morning of the attack, yes he did not listen to the corrections officer when he was told to stay in his cell. He didn't have permission to come out. He wasn't a worker like you were a worker. He did come out and he also didn't listen to the guard when they told him to go back. And he may have said some words to you and . . . Lockett and the others perhaps. And it was shortly after that . . . when you, along with six others, beat him to a pulp unconscious. He was knocked unconscious. And if that's where that ended we might not even be here today. But that's not where it ended. It's really just where it started.
>
> That is when you went and you picked up one item after another, and these were large, heavy items that you threw down on him with all the force, all the might you had. And certainly . . . Boyd did not provoke

anything like what was done to him. So I can't possibly find mitigating factor number three either because he certainly didn't provoke the -- I'm going to say it again -- the inhumane defenseless attack that he sustained at your hands along with . . . Lockett and the others. I'm not sure how a human being can do that to another person. I . . . can't comprehend that. But certainly he didn't provoke it.

Now as far as number five goes, mitigating factor number five, that the victim['s] conduct induced or facilitated it[]s commission. Again, for the same reasons, he most certainly did not induce or facilitate the vicious attack that fell upon him.

Addressing whether the sentence for these convictions should run consecutive or concurrent with defendant's previous sentence, the court found:

. . . This case screams out for a consecutive sentence under Yarbough.[4] It's only fair that the court sentence you to a consecutive sentence. Anything else would certainly be sending the wrong message and would mean nothing. It would be a completely free crime that you would have gotten away with if I do not impose a consecutive sentence here. So the Yarbough factors, in this court's estimation, most certainly dictate a consecutive sentence.

Echoing his argument regarding provocation, defendant seeks to cast Boyd as the provocateur, inducing defendant's actions. Consistent with our conclusion as to inadequate provocation, we perceive no error in the court's

---

4 State v. Yarbough, 100 N.J. 627 (1985).

17

rejection of mitigating factors three and five. Considering defendant's assault continued, even escalated, after Boyd was rendered unconscious and defenseless, the court did not err in rejecting these mitigating factors.

Further, we discern no error in the court's decision to impose consecutive sentences. Predominantly, as the court recognized, the crimes here "had absolutely nothing whatsoever to do with [defendant's earlier] murder case." This finding and the other Yarbough factors the court found—crimes "committed at different times in separate places . . . [to] two separate victims"— were based on competent credible evidence in the record. See id. at 643-44.

In imposing consecutive sentences, the court explicitly assessed the overall fairness of the sentence imposed – finding "[i]t's only fair that the court sentence you to a consecutive sentence." See State v. Torres, 246 N.J. 246, 267-68 (2021). The application of our guidelines to these proceedings does not shock our judicial conscience such that we might substitute our judgment for that of the sentencing court.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

18